UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SEAN O. LEES,

         Plaintiff,

                              Case No.: 3:06-cv-1106-J-33TEM

vs.

DYNAMIC EDUCATIONAL SYSTEMS, INC.,

         Defendant.

_____/

### ORDER

This matter comes before the Court pursuant to Defendant's Motion for Summary Judgment (Doc. # 21), filed on December 18, 2007. Plaintiff filed a response in opposition to the motion for summary judgment on January 18, 2007 (Doc. # 30).

After due consideration and for the reasons stated in this Order, the motion for summary judgment is denied as to each count in Plaintiff's complaint.

## I.  Factual Allegations

### A.  The Parties

Plaintiff Sean O. Lees was employed as a facilities manager for Defendant Dynamic Educational Systems, Inc. (hereafter "DESI") from September 1, 2003 until December of 2005. (Lees Dep. Doc. # 21-6 at 18:13-25).  DESI had contracts with the Federal

government to maintain some of the federal Job Corps Centers around the country, including the center in Jacksonville, Florida. (Compl. Doc. # 2 at ¶ 7; Answer Doc. # 6 at 2).  As a facilities manager, Lees was responsible for overseeing maintenance and buildings issues for seven of the Job Corps centers, among other duties. (Lees Dep. Doc. # 21-6 at 24:1-9). Lees was based out of the Jacksonville Job Corps Center, and he traveled to six other Job Corps Centers from time to time: Montgomery, Oneonta, Delaware Valley, Carl D. Perkins, and Gulfport. (Lees Dep. Doc. # 21-6 at 24:13).  Each center had its own maintenance or facilities person. (Lees Dep. Doc. # 21-6 at 28:3-6).  Lees provided technical assistance to the facilities persons at each of the above-named Centers, among other duties.[1]

When Lees began his employment with DESI as a facilities manager in 2003, he was supervised by an individual named Lisa Odle. (Lees Dep. Doc. # 21-6 at 41:3-5).  Odle was replaced by a female supervisor named Rene Nutter. (Lees Dep. Doc. # 21-6 at 41:3-5).[2]  Nutter was the vice president of operations for Job

---

[1] Lees indicates, "as Facilities Manager I provided technical assistance for the maintenance, repair, upgrade, demolition, construction, and reconstruction of the physical facilities at seven Job Corps centers that were administered by DESI." (Lees Aff. Doc. # 25-3 at ¶ 2).

[2] Rene Nutter married after the events alleged in this case, and her name is now Rene Santangelo.  This Order shall refer to her

Corps Centers. (Nutter Dep. Doc. # 21-5 at 16:4-6).  Nutter was not based out of the Jacksonville Center, and apparently, she supervised Lees for some time before meeting him face-to-face. (Compl. Doc. # 2 at ¶ 8).  On May 17, 2005, Nutter traveled to Jacksonville to visit the Jacksonville Center. (Compl. Doc. # 2 at ¶ 9).

   **B.   The Evening in Question**

   On May 20, 2005, Nutter invited Lees to have dinner and drinks after work. (Lees Dep. Doc. # 21-6 at 48:6-8).  Lees and Nutter left work together in Lees' 2003 Tahoe, a SUV, with Lees driving the vehicle. (Lees Dep. Doc. # 21-6 at 49:9-16).  The Tahoe had bucket seats and a center consol. (Lees Dep. Doc. # 21-6 at 49:19-22).  Lees and Nutter visited several bars and restaurants that evening.  From the record, it appears that they consumed food and alcohol at three establishments in the Jacksonville Beach area.  Next they traveled to Jacksonville Landing to visit the bar known as the Twisted Martini with Lees driving the Tahoe. (Lees Dep. Doc. # 21-6 at 56:4-16).

   Lees alleges that approximately twenty minutes into the forty minute drive to the Twisted Martini, Nutter mounted Lees

---

as Rene Nutter or Nutter, her name at the time of the alleged incidents because she is referenced in the documents and testimony as Rene Nutter.

while he was driving the vehicle. (Lees Dep. Doc. # 21-6 at
57:19-22).   Lees alleges that his ability to safely drive the
vehicle was compromised, and he pulled off to the side of the
road (Lees Dep. Doc. # 21-6 at 59:17-23).   Lees explains: "She's
my boss . . . I'm freaking out. . . . Her whole behavior just
blew me completely out of the water. . . . Think about it, you're
going down the road and all of a sudden your boss is on top of
you.   Yeah, you're kind of weirded out." (Lees Dep. Doc. # 21-6
at 60:23-3, 18, 20-22).   Lees indicates that he convinced Nutter
to get out of his lap with and gestures and statements: "Like I
said, it was more like gestures, you know, 'I've got the steering
wheel.   You need to get off.   I've got traffic behind me.   We're
going to get busted by the cops. We're drinking." (Lees Dep. Doc.
# 21-6 at 62 at 21-24).   According to Lees, the conversation
returned to an "even keel" after Nutter allegedly mounted him,
and they arrived safely at the Twisted Martini. (Lees Dep. Doc. #
21-6 at 72:8-14).

Lees alleges that, at the Twisted Martini, he "was sitting
at the bar trying to stay away from [Nutter]." (Lees Dep. Doc. #
21-6 at 75:1-2).   But, according to Lees, Nutter wanted to dance,
and she tried to change Lees' mind: "I was sitting at the bar and
she wanted to dance some more and I didn't want to get off the
bar stool, and she spread my legs and got in between my legs and

-4-

rubbed her ass up and down my inside of my legs." (Lees Dep. Doc. # 21-6 at 75:18-21). Nutter allegedly repeated this dancing invitation several times. (Lees Dep. Doc. # 21-6 at 76:1-4). Lees indicates that he tried to move away from her and gave her a "disgusted" look. (Lees Dep. Doc. # 21-6 at 76:16-17; 79:5). Lees felt "intimidated" by Nutter's actions. (Lees Dep. Doc. # 21-6 at 79:2). Lees hinted that he wanted to leave the bar, but Nutter did not want to leave, and they stayed at the bar until it closed. (Lees Dep. Doc. # 21-6 at 79:8-25; 84:6-25; 85:1-2). Lees asserts that while they were at the Twisted Martini, Nutter was "flirtatious" with both men and women. (Lees Dep. Doc. # 21-6 at 100: 12-24).

Lees and Nutter engaged in "small talk" during the drive from the Twisted Martini to Nutter's hotel. (Doc. # 21-6 at 85:19). Then, according to Lees, Nutter put her hands on the zipper of Lees' pants and put her face in his lap in an attempt to initiate oral sex with Lees. (Lees Dep. Doc. # 21-6 at 1-12). Lees asserts that he pushed her away. (Lees Dep. Doc. # 21-6 at 87:13-14). He felt that this conduct was "serious," he was certain that she "wanted to get in[to his] pants," and he "wanted her out of [his] lap." (Lees Dep. Doc. # 21-6 at 87:21-22, 89:6). Lees saw a Denny's restaurant and decided to take Nutter to Denny' restaurant. (Lees Dep. Doc. # 21-6 at 89:10-13).

According to Lees, he felt that they both needed to have some coffee and "needed something besides being in that truck." (Lees Dep. Doc. # 21-6 at 90:1-11).  Lees estimates that it was approximately 2:30 a.m., and there was not much conversation between Lees and Nutter at the Denny's restaurant. (Lees Dep. Doc. # 21-6 at 92:12-13, 90:15-16).

After drinking coffee and having a bite to eat at the Denny's restaurant, Lees drove Nutter to her hotel, which was a few minutes away from the Denny's restaurant. (Lees Dep. Doc. # 21-6 at 91:1-3). Lees alleges that when Nutter got out of the truck, she stated to him, "You'll regret this" and then slammed the truck door. (Lees Dep. Doc. # 21-6 at 93:23-24, 94:1).  Lees interpreted Nutter's statement to mean that Lees would live to regret rejecting Nutter's sexual advances. (Lees Dep. Doc. # 21-6 at 95:18-19).

It appears from Defendant's motion for summary judgment that Nutter denies that she made any sexual advances toward Lees.  The record contains limited excerpts from Nutter's deposition, and these excerpts do not address the majority of Lees' claims in this action. (Nutter Dep. Doc. # 21-5).[3]  DESI, the defendant in

---

[3]   This Court is puzzled by the parties' decision to file limited deposition excerpts in this case, rather than filing entire depositions.  There are many references in the pending motion and response to deposition testimony that is plainly not before the

this action, denies that Nutter made sexual advances toward Lees. (Answer Doc. # 6).

## C. <u>Lees' Employment after the Evening in Question</u>

Lees submits that after the incident, Nutter, as his direct supervisor, engaged in a pattern of behavior designed to "shut him down" in anticipation of firing him. (Lees Dep. Doc. # 21-6 at 120:67; 121:18-24; 172:7-8; Lees Aff. Doc # 25-3 at ¶ 8). Lees submits that Nutter cut off his ability to communicate with the other Centers and that she reduced his ability to travel. (Lees Dep. Doc. # 21-6 at 103:2-12; 105:17-22). Lees submits that prior to his evening of drinking with Nutter, he spent a great deal of his time traveling to the Centers that he assisted as a facilities manager. (Lees Dep. Doc. # 21-6 at 103:9-12). He notes that a trip to the Montgomery Center was cancelled in August and a trip to the Gulfport Center was also cancelled. (Lees Dep. Doc. # 21-6 at 124:5-9; 125:3-5). Lees indicates that even though his travel was reduced, he still had plenty of work to do, he enjoyed his work, and he worked forty hours a week. (Doc. # 21-6 at 133:21-23). During his deposition, he explained: "I was allowed to help maintenance of Jacksonville. I was allowed to answer the phone if they had any questions on other

---

Court. Nevertheless, from the present record, this Court determines that summary judgment is not proper.

centers.   And that was about it." (Lees Dep. Doc. # 21-6 at 134:6-9).[4]

Nutter, on the other hand, indicated during her deposition that she reduced his communications with the directors of the Centers and canceled Lees' trips to the Centers because she believed that Lees was abusing his travel privileges: "I think [Lees] was coercing the center directors just to travel and that is very expensive and I thought it was unnecessary. . . . The expense involved.   You pay for all meals, the hotel, the flight or the drive there.   And I believe [Lees] had family in that area, so he liked going there a lot." (Nutter Dep. Doc. # 21-5 at 54:9-12; 57:19-25).   In addition, Nutter explained that she did not involve him in projects related to the hurricane Katrina disaster, which struck the Gulfport Center, because, among other things, she thought that Lees "was trying to insert himself because he wanted the contract for a friend." (Nutter Dep. Doc. # 21-5 at 78:19-21).

Lees also submits that after the evening of drinking with Nutter, he was denied bonus payments that he expected to receive.

---

[4]   Plaintiff asserts in response to the motion for summary judgment, "As a practical matter, by refusing to allow the Center Directors to communicate with Lees and by refusing to allow him to travel, Nutter effectively removed Lees from virtually all of his responsibilities." (Doc. # 25 at 5).

Specifically, Lees explains that he was accustomed to receiving seven bonus payments per year for a total of $ 15,000, and that he did not receive three of the seven bonus payments after Nutter became his supervisor:

> From January 1, 2005, through the pay period ending May 13, 2005, I was paid four bonuses in the amount of $2,143 each. Approximately one week after I received my May 2005 bonus, Rene Nutter sexually harassed me in Jacksonville, and when I refused her advances, she told me that I would regret it. After that, although I had three more bonuses due, I never received another bonus while I was under Nutter's supervision.

(Lees Aff. Doc. # 25-3 at 3).

### D.   **DESI's Investigation**

On October 4, 2005, Lees sent a letter to Barbara Woodman, DESI's human resources director, complaining about Nutter's alleged sexual harassment and retaliation against Lees. (Woodman Dep. Doc. # 21-5 at 33; 10:4-5; Lees Aff. Doc. # 25-3 at 3). The letter is not before the Court. Lees submits that "approximately ten days after complaining to Woodman, [Lees] received a bonus." (Doc. # 25-3 at 3). Nonetheless, Lees contends that he "never received the two bonuses [he] was denied during the period when Nutter was retaliating against [Lees]." (Lees Aff. Doc. # 25-3 at 4).

Lees indicates that after he complained about Nutter's alleged sexual harassment, he was notified that his supervisor

was being changed immediately to Bob Swank, the Chief Financial Officer of the company. (Lees Dep. Doc. # 21-6 at 140: 2; Doc. # 25-4 at 9). After Lees was transferred to Swank's supervision, all communications between Lees and Nutter ceased. (Lees Dep. Doc. # 21-6 at 140: 19-22). DESI conducted an investigation of the sexual harassment claim. (Lees Dep. Doc. # 21-6 at 141:9-15). Woodman interviewed Lees on October 14, 2005 and interviewed Nutter on October 5, 2005. (Woodman Dep. Doc. # 21-5 at 33:1-7). According to Woodman, when Nutter was told of Lees allegations, Nutter put her head in her hands and sobbed. (Woodman Dep. 21-5 at 55:16-20). On November 10, 2005, at the end of the investigation, Woodman authored a disciplinary memorandum on DESI stationary addressed to Nutter. Among other things, the disciplinary memorandum stated:

- As you know, we became concerned that you may have violated company policies against sexual harassment and retaliation. As a result of our concerns we investigated the matter and based on all of the information we have, we have made a number of determinations. There determination include the following:
- We cannot substantiate that sexual conduct may or may not have occurred; however, we can substantiate that you and Mr. Lees did have dinner and drinks on May 19, 2005, both parties were drinking, and you visited multiple restaurants and bars during the course of the evening returning to your hotel in the early morning hours.
- We cannot substantiate allegations of retaliation against Mr. Lees as we believe legitimate business reasons for trip cancellations and communication

flows regarding construction work at the Centers exist.

- We can substantiate that you operated heavy equipment while at the Delaware Valley Job Corps Center.
- We are very concerned about the fact that these events occurred.
- You and Mr. Lees could have been the cause of a serious traffic accident causing severe trauma to yourselves and others.
- During the course of this investigation, we obtained information from a number of sources that calls into question other occasions where your conduct in relation to the company's standards would be deemed inappropriate.
- As a result of the investigation, this notice will serve as a final written warning that should **any** form of inappropriate behavior occur again, you will immediately be terminated.
- As discussed, retaliation is not tolerated and under no circumstances should any retaliatory behavior be exhibited towards Mr. Lees or any other witness interviewed. Immediate termination will result if retaliation in any form exists. We will not tolerate such activity on the part of any employee, whether they are a corporate officer or not.

(Doc. # 21-5 at 36)(emphasis in original)

Woodman explained further in her deposition:

[W]e reviewed the investigation file, Rene [Nutter] is an officer of the corporation, and . . . it was not conduct nor becoming of an officer to be out drinking with your subordinates, when you are out representing the company on business to be drinking into the wee hours of the night. In the investigation, we also became aware of the fact that [Nutter] was operating heavy equipment that she was not trained to do, so not only did she put herself in jeopardy, she potentially exposed other people to some safety risks, et cetera. So in light of that, we felt it was a stern message to [Nutter] that she must always be cognizant of the behavior, her behavior, when she is representing our

-11-

company anywhere on any of our centers.
(Woodman Dep. Doc. # 21-5 at 57:10-25; 58:1-3). In addition to
the foregoing, it appears that Nutter was also required to attend
one-on-one sexual harassment training. (Doc. # 25 at 16; Doc. #
25-4 at 8).   Lees was not formally disciplined for his
involvement in the alleged incident.   (Woodman Dep. Doc. # 21-5
at 133:21-23).

### E.  Lees' Termination from DESI

#### 1.  G&A Expenses

On December 28, 2005, just over one month after the
conclusion of the investigation of Lees' charges against Nutter,
Lees was terminated and escorted off the premises. (Lees Dep.
Doc. # 21-6 at 182:21-23; 183:1-6; Doc. # 25-4 at 8).   Swank
informed Lees that his position, facilities manager, was being
eliminated because the general and administrative or G&A expenses
for DESI were too high.

Nutter stated during her deposition, "All of us that work in
the corporate office would come out of G&A expense.  It was part
of the expense that a government understands is reasonably
expected to operate the centers. (Nutter Dep. Doc. # 21-5 at
22:14-18).   She later offered a different explanation of Lees'
pay as follows:

Q:   Okay, What is this about?

-12-

A:    This would be is Sean [Lees] were going to a Center to provide technical assistance, his time should be-well it depends in what capacity he was providing the technical assistance, he should directly charge the contract for that.

Q:    And what is the purpose of those numbers? If he charges the contract, what impact does that have?

A:    It would go on the Center contract versus the G&A expense.

Q:    Which means what?

A:    It means that if he were doing something directly for a Center, not in the capacity of a corporate person, it would be charged to the contract versus G&A.

(Nutter Dep. quoted in Doc. # 25 at 12).

With respect to the reasons behind Lees' termination, Swank testified as follows: "Our G&A was running high. I look at the numbers all the time.   There's caps on the contracts.   Even though they're cross add contracts, there are caps, and our G&A was exceeding the cap." (Swank Dep. Doc. # 21-4 at 21:24-25, 22: 1-2).   Swank further testified that DESI "didn't have money in the contracts for [Lees'] position, it wasn't bid in when we bid the contracts." (Swank Dep. Doc. # 21-4 at 22:11-13).   Swank added, "Basically the information that I came up with is that the position wasn't needed, that we could save G&A dollars by not having Mr. Lees with us, and the decision was made to terminate the position." (Swank Dep. Doc. # 21-4 at 23:3-6).   It appears from Swank's testimony that Swank determined that Lees was unnecessary to DESI several months prior Lees' termination.

(Swank Dep. Doc. # 21-4 at 24:6-20).

Contrary to Swank's testimony, Lees asserts that he was not paid out of G&A funds, so the G&A justification for his termination was pretextual or otherwise incorrect. Lees asserts that his pay and bonuses were "shared expenses of the seven Job Corps Centers" that he worked for as facilities manager. (Lees Aff. Doc. # 25-3 at ¶ 3). Lees further explains, "As with the bonuses, my time was charged to the various Centers, based on the services I was performing for each particular Center. These services were direct charges to the Centers for which DESI was reimbursed by the Department of Labor." (Lees Aff. Doc. # 25-3 at ¶ 11). Accordingly, Lees' response to Defendant's summary judgment motion asserts that "Lees' salary and bonuses were not paid from G&A funds. Rather, they were direct-billed to the individual Job Corps Centers, for which DESI was reimbursed." (Doc. # 25 at 2).

## 2.  **Decision-Makers in Lees' Termination**

Swank testified at his deposition that he was aware that Lees had filed a "complaint" against Nutter with DESI prior to Lees' being transferred from Nutter's supervision to Swank's supervision. (Swank Dep. Doc. # 21-4 at 17:8-25; 18:1-3). Swank testified that he was "curious" about the nature of Lees' complaint against Nutter, he asked Woodman about the substance of

the complaint, but Woodman did not provide Swank with the nature of Lees' complaint. (Swank Dep. Doc. # 21-4 at 8-25). Swank also testified that he had correspondence with Nutter about Lees after Lees was transferred to his supervision and away from Nutter's supervision. (Doc. # 21-4 at 18:4-14). Swank testified that he consulted with many people regarding Lees before terminating Lees, including, among others, the center directors, Deb Perkins, Jim Cashin, Mr. Stout, and other people that he cannot remember (19:8-19; 20:2-20; 21:6-7). Significantly, Swank consulted with Rockow about Lees "shortly before Christmas." (Swank Dep. Doc. # 21-4 at 23:22-25).[5] Lees argues that it is uncontested that Rockow was aware of every aspect of the investigation and knew every contour of Lees' allegations against Nutter. (Doc. # 25 at 2).

Lees filed a charge of discrimination with the EEOC (Compl. Doc. # 2 at ¶ 4). This charge is not within the record before

---

[5]  Plaintiff cites to Defendant's June 18, 2007 responses to Plaintiff's interrogatories as providing a conflict in Swank's testimony, as follows:
2.    State the names and job titles of each individual who was consulted about or participated in the decision to terminate the employment of Sean O. Lees and state what role each played in the decision, including who ultimately made the decision.

ANSWER: Robert Swank, Chief Financial Officer, made the decision to eliminate Plaintiff's position.
(Doc. # 25-2 at 5).

the Court; however, DESI's response to the EEOC charge, without attachments, has been filed with the Court.  (Doc. # 25-4 at 5).  Among other things, DESI's response letter to the EEOC indicates that Swank was the person who recommended that Lees be terminated, and that Ralph Rocklow, the Chairman and Acting President of DESI, was the person that made the final decision to terminate Lees. (Doc. # 25-4 at 9).   Further, DESI's response letter indicates that the "events contributing to the termination" were "Loss of contract" and that "there has been no replacement of this position, it has been eliminated." (Doc. # 25-4 at 9).

   **F.   <u>Lees' Complaint</u>**

   Thereafter, on December 4, 2006, Lees filed his complaint in state court, and it was removed to this Court by Defendant on December 18, 2006. (Doc. ## 1, 2).  Lees' complaint contains the following counts: (1) Quid Pro Quo Sexual Harassment in Violation of the Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes; (2) Retaliation in Violation of the Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes; (3) Quid Pro Quo Sexual Harassment in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq.; (4) Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. (Lees Compl. Doc. # 2).  Defendant filed

-16-

its answer and affirmative defenses on December 22, 2006. (Doc. # 6).

Defendant asserts in its present motion that summary judgment is appropriate on all counts of Plaintiff's complaint. Although Defendant denies that Nutter engaged any sexual advances toward Lees, Defendant accepts the allegations regarding Nutter's sexual advances as true for the purpose of summary judgment only, and contends that Lees' allegations are still insufficient. Defendant contends, as a matter of law, that Lees did not suffer a "tangible employment action" to sustain either his discrimination claim or his retaliation claim. Further, Defendant asserts that, even if Lees did suffer from a "tangible" employment action, all decisions affecting Lees were based on valid business decisions and were not the product of sexual harassment or retaliation. This Court will address these arguments and others in turn.

## II.  __Legal Standard__

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute alone is not enough to defeat a properly pled

motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or

evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor.  Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment.  Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).  However, if non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required.  Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981), cert. denied, 456 U.S. 1010 (1982).

### III. **Analysis**

Plaintiff asserts sexual harassment and retaliation claims against Defendant under Title VII of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000(e), et seq.) as well as under the Florida Civil Rights Act of 1992 (FCRA).  Because the Florida Civil Rights Act of 1992 was modeled after Title VII, this Court analyzes these claims under the same framework.  See Gamboa v. American Airlines, 170 Fed. Appx. 610, 612 (11th Cir. 2006)(claims under Title VII and the Florida Civil Rights Act are

-19-

analyzed under the same framework).

**A.   Discrimination**

Lees may employ one of three means to establish a prima facie case of employment discrimination under FCRA and Title VII: (1) direct evidence of discriminatory intent, (2) statistical analysis evidencing a pattern of discrimination, or (3) circumstantial evidence meeting the test established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Verbraecken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989). Lees presents neither direct nor statistical evidence of discrimination. The Eleventh Circuit, in Castle v. Sangamo Westin, Inc., 837 F.2d 1550, 1558 n.13 (11th Cir. 1988) explained that direct evidence is "evidence, which if believed, proves the existence of a fact in issue without inference or presumption." An example of direct evidence in an age discrimination case, for example, would be a scrap of paper saying, "Fire Rollins—she is too old." Id.

In Castle, the Eleventh Circuit found that no such evidence existed. Similarly, the Court finds that Lees has not provided such direct evidence, as the evidence provided does not permit a finding of discriminatory intent without inference or presumption. Moreover, Lees has not provided any statistical evidence. Thus, Lees' case is limited to circumstantial evidence.

-20-

In analyzing allegations supported by circumstantial evidence under either the FCRA or Title VII, the Court follows substantively the same burden-shifting analysis established in McDonnell Douglas and its progeny. See Gamboa v. American Airlines, 170 F. App'x 610, 612 (11th Cir. 2006)((citing Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998). Under the McDonnell Douglas framework, Lees bears the initial burden of establishing a prima facie case of discrimination against Defendant DESI. McDonnell Douglas, 411 U.S. at 802.

If Lees successfully establishes a prima facie case of discrimination, a rebuttable presumption of discrimination is created and the burden of proof then shifts to Defendant. McDonnell Douglas, 411 U.S. at 802-03; Dickinson v. Springhill Hosps., Inc., No. 05-16885, 2006 U.S. App. LEXIS 16613, at *6 (11th Cir. June 29, 2006)(citing EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1272 (11th Cir. 2000)). To rebut the presumption created by Lees' prima facie case, Defendant must provide "legitimate, nondiscriminatory reason[s]" for the employment action taken against Lees. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1331 (11th Cir. 1998). However, "[t]his is a burden of production, not persuasion." Standard, 161 F.3d at

-21-

1331. "[Defendant] must merely produce evidence that could allow a rational fact finder to conclude" its actions were not motivated by discriminatory animus. Id. If Defendant produces such evidence, the burden shifts back again to Lees. McDonnell Douglas, 411 U.S. at 802-03. Lees then "has the opportunity to come forward with evidence, including the previously produced evidence establishing [his] prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)(citations omitted).

**B.   Quid Pro Quo Sexual Harassment**

In the landmark case of Burlington Industries v. Ellerth, 524 U.S. 742 (1998), the Supreme Court distinguished between quid pro quo sexual harassment and hostile work environment sexual harassment:

> Cases based on threats which are carried out are referred to often as quid pro quo cases, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment.  The terms quid pro quo and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility.

Id. at 751.

The Ellerth decision explored the distinctions between quid

-22-

pro quo and hostile work environment cases within the context of deciding when vicarious liability attaches in sexual harassment cases.   In _Ellerth_, the employee suffered sexual harassment at the hands of her direct supervisor.   The Court noted, "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." _Id._ at 753-754.   Furthermore, the Court determined, "When a supervisor makes a tangible employment decision, there is assurance that the injury could not be inflicted absent the agency relationship . . . . [and] a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer." _Id._

In this case, Lees asserts that Nutter, acting as his direct supervisor and acting on behalf of Defendant DESI, denied him bonus payments, altered his travel schedule, reduced his duties as an employee, and ultimately paved the way for his termination. Lees asserts that Nutter engaged in this course of conduct due to Lees' failure to acquiesce to a sexual relationship with Nutter. These allegations bring this case within the ambit of quid pro quo sexual harassment.   Plaintiff does not bring hostile work environment claims against Defendant.

-23-

As stated by the Eleventh Circuit in <u>Virgo v. Rivera Beach</u> <u>Associates</u>, "Quid pro quo sexual harassment occurs when an employer changes an employee's conditions of employment because of their refusal to submit to sexual demands." 30 F.3d 1350, 1361 (11th Cir. 1994). The Eleventh Circuit set forth the prima facie elements for a quid pro quo sexual harassment claim in <u>Virgo</u> to include: "(1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; and (4) the employee's reaction to the unwelcome behavior affected tangible aspects of the employee's compensation, or terms, conditions, or privileges of employment." <u>Id.</u> at 1361 (citing <u>Sparks v. Pilot Freight</u> <u>Carriers</u>, 830 F.2d 1554, 1557 (11th Cir. 1987); <u>see also</u> <u>Scelta</u> <u>v. Delicatessen Support Servs.</u>, 89 F. Supp. 2d 1311, 1325 (M.D. Fla. 2000)(same).

In this case, Defendant does not appear to challenge the evidence concerning the first prong of Plaintiff's prima facie case: whether Plaintiff Lees is a member of a protected class.[6] While Defendant denies that Nutter subjected Lees to unwelcome sexual harassment on the basis of sex, Defendant assumes, for the

---

[6] As stated in <u>Oncale v. Sundowner Offshore Servs.</u>, 523 U.S. 75, 78 (1998), "Title VII's prohibitions of discrimination 'because of sex' protects men as well as women."

purpose of summary judgment only, that Defendant meets these requirements thus satisfying the second and third prong of Plaintiff's prima facie case.[7] Defendant contends that, even if Nutter subjected Lees to the alleged sexual behavior, Lees cannot meet his burden on the fourth prong of his prima facie case: that the alleged sexual harassment and Lees' reaction to it affected a tangible aspect of Lees' employment. As such, Defendant asserts that Lees has not alleged a prima facie case of discrimination.

## 1. __Tangible Employment Action__

There is no shortage of case law distinguishing between conduct rising to the level of "tangible employment action" in discrimination cases, and conduct that merely annoys, irritates, or insults an employee. In Ellerth, the Court determined that "a tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761. The Court further explained that "a tangible employment action in most cases inflicts direct economic harm." Id. at 762.

_____

[7] Defendant asserts in the motion for summary judgment, "Nutter emphatically denies all of plaintiff's allegations of improper conduct, and if the Court does not grant summary judgment, DESI will argue to the jury how inherently unbelievable plaintiff's story is." (Doc. # 21 at 4).

In <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1238 (11th Cir. 2001) the Eleventh Circuit noted that it has "never adopted a bright line test for what kind of effect on the plaintiff's 'terms, conditions, or privileges' of employment the discrimination must have for it to be actionable" and further remarked that such a "rigid test" would be improper. (citing <u>Gupta</u>, 212 F.3d at 586). The Eleventh Circuit has explained, "It is clear, however, that not all conduct by an employer negatively affecting an employee constitutes adverse employment action." <u>Id.</u> (citing <u>Wideman v. Walmart Stores, Inc.</u>, 141 F.3d 1453, 1456 (11th Cir. 1998); <u>Wu v. Thomas</u>, 996 F.2d 271, 273-74 (11th Cir. 1993)).

In <u>Davis</u>, the Eleventh Circuit further clarified that, "Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace." 245 F.3d at 1238-1239. The Eleventh Circuit has stated generally that "[t]o prove adverse employment action in a case under Title VII's antidiscrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment." <u>Id.</u> at 1239-40. "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."

Id. at 1240 (citing Doe v. Dekalb County School Dist., 145 F.3d 1441, 1453 (11th Cir. 1998)). Because adverse employment action is a necessary element of a discrimination case, a plaintiff's failure to "present sufficient evidence for a reasonable jury to find that this element was met is fatal to [his] case." Turlington v. Atlanta Gas and Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998).

Among other things, Lees contends that he was subjected to the denial of bonus payments in the amount of $4,285. (Doc. # 25 at 1; Lees Aff. Doc. # 25-3 at ¶ 8). This allegation alone, which does not appear to be contested by Defendant, is sufficient to constitute an adverse employment action. It is not necessary at this point to evaluate Lees' allegations regarding the denial of travel requests, the diminishment of his duties at the Centers, and other, less serious, allegations. The denial of thousands of dollars in bonus payments is unquestionably a tangible employment action affecting an employees' compensation. In Russell v. Principi, 257 F.3d 815 (D.C. Cir. 2001), the court commented, "a bonus is a tangible, quantifiable award, more analogous to one's salary or to a benefit of one's employment . . . . [i]t has a more, direct measurable, and immediate effect. Furthermore, the loss of a bonus that is worth hundreds of dollars is not a petty detriment." Id. at 819. Plaintiff's

-27-

affidavit describes the denial of his bonus payments.(Lees Aff. Doc. # 25-3 a ¶ 8).   In addition, Plaintiff asserts that he complained about the denial of his bonus payments to Barbara Woodman.   This Court finds that the loss of $4,285 in bonus payments, an issue not addressed by Defendant in its motion for summary judgment, is a tangible employment action, and Defendant has not set forth any justification whatsoever for the denial of the bonus payments.

As the movant, Defendant has failed to meet its burden under Rule 56 of the Federal Rules of Civil Procedure as to Plaintiffs' discrimination claims as Defendant has not shown the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.   Further, Defendant has not demonstrated that it is entitled to judgment in its favor as a matter of law on Plaintiff's discrimination claims.   Indeed, a reasonable and fair-minded jury could find that Plaintiff was denied his bonus payments, and suffered other adverse employment consequences, on the basis of his response to Nutter's unwelcomed sexual advances.   Accordingly, this Court denies Defendant's motion for summary judgment on Plaintiff's quid pro quo discrimination claims under the Civil Rights Act of 1964 and the Florida Civil Rights Act of 1992.

C.   <u>**Retaliation Claims**</u>

Title VII's retaliation provision prohibits employers from discriminating against their employees because they have opposed employment practices made unlawful by other sections of Title VII. 42 U.S.C. § 2000e-3(a). The goal of this provision is to "prevent an employer from interfering with an employee's efforts to secure or advance enforcement of the Act's basic guarantees, including freedom from discrimination." <u>Burlington N. & Santa Fe R.R. Co. v. White</u>, 126 S.Ct. 2405, 2407 (2006). Accordingly, "retaliation is a separate offense under Title VII; an employee need not prove the underlying claim of discrimination for the retaliation claim to succeed." <u>Sullivan v. Nat'l R.R. Passenger Corp.</u>, 170 F.3d 1056, 1059 (11th Cir. 1999)(citations omitted).

Lees asserts that his termination from DESI resulted from retaliation, and he has supported his allegations of retaliation against Defendant with circumstantial evidence.  The <u>McDonnell Douglas</u> burden shifting analysis for a retaliation claim is analogous to the burden shifting analysis employed for a discrimination claim when circumstantial evidence is used to allege retaliation. <u>Johnson v. Booker T. Washington Board Serv.</u>, 234 F.3d 501, 507 at n.6 (11th Cir. 2000); <u>see also</u> <u>James v. Ala. Dep't of Revenue</u>, 206 F. App'x 869, 871 (11th Cir. 2006). "If a plaintiff makes out a prima facie case of retaliation, the burden

-29-

shifts to the defendant to produce legitimate reasons for the adverse employment action." Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002). "If the defendant offers legitimate reasons, the presumption of retaliation disappears", and "[t]he plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." Sullivan, 170 F.3d at 1059 (internal quotations and citations omitted). "The plaintiff must [then] prove by a preponderance of the evidence that the legitimate reasons offered by the employer for taking the adverse action were not its true reasons." DeLong v. Best Buy Co., 211 F. App'x 856, 858 (11th Cir. 2006)(citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)).

### 1.   Prima Facie Retaliation

"Retaliation is a separate violation of Title VII. 'To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to [his] protest,' so long as [he] had a reasonable good faith belief that the discrimination existed.'" Gupta v. Florida Bd. of Regents, 212 F.3d 571, 586 (11th Cir. 2000)(quoting Meeks v. Computer Assocs. Int'l., 15 F.3d 1013, 1021 (11th Cir. 1994). In order to establish a prima facie case of retaliation under Title VII a plaintiff must show that (1) he engaged in statutorily protected

expression; (2) he suffered an adverse employment action; and (3) there was a causal connection between the two events. Pennington v. City of Huntsville, 261 F.3d 1261, 1266 (11th Cir. 2001); Brochu, 304 F.3d at 1155; Harper, 139 F.3d at 1389-91 (FCRA retaliation claim analyzed under same framework as Title VII retaliation claim).

Defendant does not contest the fact that Lees complained about Nutter's advances. However, Defendant asserts that Lees' retaliation claim must fail because Lees did not suffer an adverse employment action. Further, Defendant contends that there is no causal connection between the statutorily protected expression and the alleged adverse employment action. The Court addresses each argument in turn.

### i. Statutorily Protected Expression

It is undisputed that Lees complained about Nutter's alleged conduct. After Lees complained, DESI conducted a full investigation into the matter, disciplined Nutter, and transferred Lees from Nutter's supervision to Swank's supervision. Later, Lees filed a complaint with the EEOC, and Defendant responded. Title VII protects "individuals who have filed formal complaints," and those "who informally voice complaints to their superiors or who use their employer's internal grievance procedures." Rollins v. Fla. Dep't of Law

-31-

_Enforcement_, 868 F.2d 397, 400 (11th Cir. 1989); _see also_ _Hankins_ _v. Air Tran Airways, Inc._, No. 06-15406, 2007 WL 1705579, at *5 (11th Cir. June 14, 2007).  It is clear and undisputed that Lees engaged in statutorily protected activities in this case.

## ii. **Adverse Employment Action**

In _White_, the Supreme Court recently held that the standards for finding adverse employment action in discrimination and retaliation claims are not the same. _White_, 126 S.Ct at 2414. Namely, the Supreme Court held that the threshold for finding a materially adverse employment action is less substantial for retaliation claims. _Id._; _see also_ _Taylor v. Roche_, 196 F. App'x 799, 802-03 (11th Cir. 2006)(failure to grant shift change, drawing all reasonable inferences in plaintiff's favor, could be adverse action).

In _White_, "the Supreme Court . . . defined an adverse employment action in context of a retaliation claim as an action by an employer that is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." _Wallace v. Ga. Dep't of Transp._, 212 F. App'x. 799, 802 (11th Cir. 2006)(quoting _White_, 126 S.Ct. at 2409).   Here Plaintiff was terminated a little over one month after the investigation of Plaintiff's sexual harassment claim. Termination is the ultimate employment decision, and certainly

qualifies as an adverse employment action.

### iii.  **Causal Connection**

In order to establish the requisite causal connection, "a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." Gupta, 212 F.3d at 590 (quotations omitted); see also DeLong, 211 F. App'x at 857-58 ("a plaintiff must generally establish that the decision maker was aware of the protected conduct at the time of the adverse employment action.")(citations omitted). In order to establish the requisite causation for a prima facie case of retaliation, circumstantial evidence of a "'close temporal proximity' [between the protected activity and the adverse action] may [also] be sufficient to show that the[y] were not 'wholly unrelated.'" Id.

Defendant contends that it is entitled to summary judgment because "It is undisputed that Swank was unaware of plaintiff's complaint of sexual harassment when he decided to eliminate plaintiff's position, and plaintiff therefore cannot establish retaliation as a matter of law."  (Doc. # 21 at 2).  Further, Defendant asserts, "Even if Swank had known of plaintiff's complaint of sexual harassment, plaintiff has no evidence to meet his burden of establishing that Swank acted with retaliatory motive in eliminating plaintiff's position, instead of for

-33-

articulated business reasons." (Doc. # 21 at 2).

Lees was terminated just over one month after the conclusion of Defendant's investigation into his complaint.  This temporal proximity may be sufficient to permit the inference that the reprimand was not wholly unrelated to retaliatory purposes. See, e.g., Donellon v. Fruehauf Corp., 794 F.2d 598, 602 (11th Cir. 1986)(mere month lapse between EEOC complaint and discharge sufficient to satisfy prima facie causation requirement for summary judgment purposes); Berman v. Orkin Exterminating Co., Inc., 160 F.3d 697, 702 (11th Cir. 1998)(noting that causation may be established when transfers occur five weeks and two months after complaints); but see Hugdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)(three month lapse, standing alone, insufficient to create inference of causation in ADA retaliation case). Furthermore, Plaintiff alleges that Nutter effectively poisoned the well by giving information about Lees to the decision-makers regarding Lees' termination.  There is a dispute about who made the decision to terminate Lees, and the identity of the contributors to this decision.  There is a conflict in the evidence regarding who Swank consulted when considering Lees' termination, and there is also a question as to when Swank determined that Lees' termination was needed.  Swank asserts that he did not know the details of Lees' complaint about Nutter, but

he was aware that a complaint had been lodged, and that complaint was serious enough to call for Lees to be supervised by Swank, rather than Nutter.  Further, Defendant's response to the EEOC states that it was Rockow who made the final decision to terminate Lees, and there is a dispute about whether Rockow was aware of Lees' allegations of sexual harassment against Nutter. For these reasons, Lees has established sufficient causation for summary judgment purposes, and has stated a prima facie case of retaliation against Defendant.

### b.    Legitimate Business Reasons for Lees' Termination

Defendant asserts that Lees was terminated because its G&A expenses were running too high.  On the surface, this seems like a sufficient legitimate reason for Lees' termination.  However, Lees asserts that the G&A expense justification is a mere pretext.  In support of his contention, Lees points to record evidence tending to show that his bonus payments and salary, or at least some portion thereof, were not G&A expenses.

To create a genuine issue of material fact on the question of pretext, Lees "must 'demonstrate that the proffered reason was not the true reason for the employment decision.'" Jackson v. Ala. State Tenure Comm., 405 F.3d 1276, 1289 (11th Cir. 2005)(quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). He may do that "either directly by persuading

the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. In considering Defendant's summary judgment motion, "[t]he district court must evaluate whether [Lees] demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)(internal quotations and citations omitted).

Defendant asserts that it had a legitimate, non-discriminatory and non-retaliatory reason for terminating Lees: to reduce G&A expenses.  The record supports that Defendant monitored its G&A expenses, however, there are some inconsistencies in the record regarding whether Lees was paid from G&A expenses. The Court finds that there is a conflict in the evidence before this Court concerning Defendant's alleged reasons for terminating Lees, and the Court determines that a reasonable jury could find that the reason for Lees' termination was his complaint about Nutter's conduct, rather than the proffered G&A expenses associated with Lees' continued employment.

For the foregoing reasons, summary judgment on Lees'

-36-

discrimination and retaliation claims is not warranted here, and Defendant's motion is denied.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant's Motion for Summary Judgment (Doc. # 21) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Jacksonville, Florida, this 26th day of March 2008.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record